## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID CARROLL,

       Plaintiff,

vs.                                               No. CIV 08-0959 JB/ACT

LOS ALAMOS NATIONAL SECURITY,
LLC and THE LANS BENEFIT AND
INVESTMENT COMMITTEE,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment, filed December 14, 2009 (Doc. 55). The Court held a hearing on January 28, 2010. The primary issues are: (i) whether Plaintiff David Carroll's can bring a claim for civil penalties under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 through 1461, for the misconduct he alleges; (ii) whether Carroll's cause of action for negligent misrepresentation is ripe for adjudication; and (iii) whether Carroll has provided some evidence of reliance, causation, and harm related to misrepresentations by Defendant Los Alamos National Security, LLC ("LANS") and the LANS Benefits and Investment Committee ("BIC"). Because ERISA does not provide the penalty Carroll seeks for the conduct he alleges and because the Defendants' conduct has not and will not harm Carroll, the Court will grant the motion.

## <u>FACTUAL BACKGROUND</u>

Many of the material facts are undisputed. Carroll has worked at Los Alamos National Laboratory ("LANL") from January 19, 1970, until December of 1974, and from November 1975 to the present. <u>See</u> Deposition of David Carroll at 15:19-16:7 (taken August 11, 2009), filed

December 14, 2009 (Doc. 55-2)("Carroll Depo."); Affidavit of Louis Polito ¶ 4, at 2 (taken December 10, 2009), filed December 12, 2009 (Doc. 55-2). When LANL hired Carroll, he elected not to make Social Security and Medicare contributions. See Second Am. Compl. ¶ 18, at 4.

On June 1, 2006, LANS took over operation of LANL from the University of California. The Defendants contend that LANS gave Carroll the choice of participating in either Total Compensation Package 1 ("TCP1") or Total Compensation Package 2 ("TCP2"). Second Am. Compl. ¶¶ 13-16, at 3. Both TCP1 and TCP2 are benefit plans. See Response Exhibit 6, at §§ 2.48-2.49. LANS, through BIC was the plan administrator of both TCP1 and TCP2. See Plaintiff's Response to Defendant's Motion for Summary Judgment Exhibit 6, at § 2.36, filed January 5, 2010 (Doc. 57-8)("Response"). Carroll disputes the timing of the choices, and disputes that he did not have a choice between TCP1 and TCP2 until June 1, 2006. Carroll's choice to participate in either TCP1 or TCP2 was made before June 1, 2006. See Election Form at 1 (dated May 2, 2006), Exhibit to Carroll Depo., filed December 14, 2009 (Doc. 55-2).

Under TCP1, Carroll would receive a defined-benefit pension and a 401(k) savings plan without employer-matching contributions. See Carroll Depo. at 84:6-15. Under TCP2, Carroll's 401(k) plan would include employer-match contributions of 11.5% of Carroll's annual salary. See id. at 84:16-85:24; Polito Aff. ¶ 7, 10, at 2, 3. Furthermore, because Carroll selected TCP2, Carroll began drawing his pension from the University of California Retirement Plan ("UCRP") in July of 2006 while still earning his full salary from LANS, and the UCRP pays Carroll over $6,500.00 per month. See Carroll Depo. at 24:6-25:5; Polito Aff. ¶¶ 7-9, at 2-3. Under either plan, the participant would have Social Security/Medicare tax deducted from each paycheck. See Carroll Depo. at 82:10-84:1, Exhibit 17. Neither the summary plan descriptions nor the plan documents for TCP1 and TCP2 described the reimbursement policy with respect to Social Security/Medicare contributions.

See Affidavit of David Carroll ¶ 6, at 2 (dated January 5, 2010), filed January 5, 2010 (Doc. 57-7)("Carroll Aff."). If LANS was to reimburse Carroll for his Social Security/Medicare contributions, that reimbursement would occur after Carroll retires. See Carroll Depo. Exhibit 17 (specifying that only retirees are eligible for Social Security/Medicare reimbursement).

In making his decision between TCP1 and TCP2, Carroll repeatedly communicated with LANS' transition team to discover whether employees would be reimbursed under TCP2 for Social Security/Medicare contributions. See Carroll Depo. at 47:4-53:22.[1] The Defendants assert that Carroll was leaning toward choosing TCP2 before receiving any information about whether TCP2 participants would receive Social Security/Medicare reimbursements. See Motion at 2; Carroll Depo. at 67:24-68:1. Carroll contests this characterization of his deposition statement, clarifying that Carroll was asked whether he was leaning toward TCP2 before receiving the final answer regarding reimbursements and that he merely responded "Yes." Response at 1-2; Carroll Depo. at 67:24-68:1. The Defendants also assert as fact that Carroll cannot testify that he would have selected TCP1 over TCP2 even if he had known LANS would not reimburse TCP2 participants' Social Security/Medicare contributions. See Motion at 3; Carroll Depo. at 86:23-87:18. Carroll contests this fact, stating that he testified that he would not have chosen TCP2 if he had known that Social Security/Medicare contributions would not be reimbursed. See Response at 2; Carroll Depo. at 86:8-14. He argues that the inference to be gleaned from the series of hypothetical questions posed by the Defendants' counsel is that Carroll's decision whether to select TCP1 or TCP2 turned

---

[1] The Defendants used a slightly weaker version of this fact in their statement of undisputed material facts. It read: "In making his decision between TCP1 and TCP2, Plaintiff questioned whether he would receive reimbursement from LANS for the Social Security and Medicare contributions that he would be required to make as a LANS employee." Motion at 2. Giving maximum weight to the evidence that Carroll, the non-movant, provided, Carroll's interpretation of this fact is fair. See Response at 1.

on whether TCP2 participants would receive reimbursements.

Prior to making his election, Carroll was told that he would be reimbursed for his Social Security/Medicare contributions under TCP2.  See Motion at 2; Second Amended Compl. ¶¶ 22, 24, at 4, 5.  Carroll disputes the Defendants' characterization of this fact.  He asserts that LANS' transition team communicated to employees, such as Carroll, that, as a TCP2 participant, his Social Security/Medicare contributions would be reimbursed.  See Response at 2; Electronic-Mail String between Lori Greening and Ramiro Pereyra, filed January 5, 2010 (Doc. 57-5).

In April or May of 2006, Carroll received the reimbursement information related to Social Security/Medicare contributions.  See Carroll Depo. at 56:7-22; Second Amended Compl. ¶ 24, at 5.  Carroll elected TCP2 on May 2, 2006.  See Carroll Depo. at 78:6-14.  Thereafter, Carroll learned that only TCP1 participants, not TCP2 participants, would be eligible to receive reimbursement of their Social Security/Medicare contributions.  See id. at 93:23-94:15; id. Exhibit 17.  Before May 2, 2006, LANS communicated to some individuals, including Carroll, that TCP2 participants would be reimbursed for Social Security/Medicare contributions.  See id. at 47:4-53:21.

Carroll did not ask LANS or the BIC for: (i) a summary plan description of the savings/retirement plans included in TCP1 or TCP2; (ii) the plan documents regarding the savings/retirement plans included in TCP1 or TCP2; (iii) the latest annual report for the savings/retirement plans included in TCP1 or TCP2; or (iv) any instruments under which the savings/retirement plans in TCP1 or TCP2 were established or operated.  See Carroll Depo. at 89:13-91:11.[2]  On the other hand, Carroll contacted the "transition hotline" approximately fifty times

---

[2] Carroll contests these facts on the grounds that they are irrelevant because they go to whether Carroll stated a claim under 29 U.S.C. § 1024(b)(4) and that Carroll never asserted a claim under section 1024.  See Response at 2-3.

before making his plan election to try to confirm whether TCP2 participants would be reimbursed for Social Security/Medicare contributions.  <u>See</u> Carroll Depo. at 49:14-19 (Doc. 57-3).  In June and July of 2006, Carroll requested in writing information regarding how TCP2 participants would be reimbursed for Social Security/Medicare contributions.  <u>See</u> <u>id.</u> at 45:4-48:17.  Also in June and July of 2006, Carroll sent an electronic-mail transmission requesting a reimbursement policy that described the accounting and procedures related to reimbursement.  <u>See</u> Response Exhibit 7.

LANS knew that TCP2 participants would not be reimbursed for their Social Security/Medicare contributions as early as July of 2006.  <u>See</u> Response Exhibit 8 (electronic-mail string including an electronic mail transmission from Ben Glover, stating: "This section implies that Social Security Tax Reimbursement is available only for TCP1 participants.").  Thus, by August 2006, Glover knew that TCP2 participants would not be reimbursed for Social Security/Medicare contributions.  <u>See</u> <u>id.</u>  Nevertheless, Glover did not inform Carroll of this information until January of 2007.  <u>See</u> Response Exhibit 9.

Carroll currently receives about $98,000.00 per year from LANS, plus benefits, in addition to his pension of over $6,500.00 per month from UCRP.  <u>See</u> Carroll Depo. at 12:14-14:3, 24:6-25:5.  Carroll's pension from UCRP will continue to pay until he dies and then pay at fifty percent for the remainder of the life of Carroll's wife.  <u>See</u> <u>id.</u> at 26:8-17.  Carroll had contributed to Social Security for thirteen quarters before his employment by the University of California, <u>see</u> Exhibit B, Interrogatory No. 2, filed December 12, 2009 (Doc. 55-2), and has contributed for an additional fourteen quarters since becoming a LANS employee on June 1, 2006, <u>see</u> Carroll Depo. at 83:5-8. Carroll was aware that he must contribute to Social Security for forty quarters to be eligible for Social Security benefits, which would require him to work until March of 2013.  <u>See</u> Carroll Depo. at 43:13-44:13.

Nevertheless, Carroll stated in deposition that he has no retirement plans, no set retirement date, and that any estimate he could give regarding his retirement would be guesswork. See Carroll Depo. at 37:1-38:3. Carroll responds with an affidavit, stating that, because of a change in his financial circumstances, he now anticipates retiring by December 31, 2011. See Carroll Aff. ¶¶ 2-5, at 1. He further alleges that he told the Defendants this same information orally in November of 2009, though he cites no evidence to that effect. See Response at 2. Carroll has even represented that he will enter into an agreement with the Defendants that he will retire on December 31, 2011. See Response at 2.[3]

According to Louis Polito, the Benefits Program Manager at LANS, based on the life expectancy tables in the New Mexico Statutes Annotated, Carroll is expected to live until approximately 2027. See Polito Aff. ¶ 11, at 3. Based on that estimate, assuming Carroll retires at the end of 2011, he will have made approximately $40,472.00 in Social Security/Medicare contributions that, under TCP1, he would begin to have reimbursed. See id. ¶ 12, at 3-4. By electing TCP2, Carroll will receive, over the course of his lifetime, retirement benefit payments of $1,747,374.00. See id. ¶ 14, at 4. If Carroll had selected TCP1, he would receive total retirement benefits in the amount of $1,590,464.00. See id. Thus, according to Polito, based on Carroll's representation of his expected retirement date and New Mexico's estimate of Carroll's life expectancy, Carroll's benefits under TCP2 will be greater than they would have been under TCP1.

---

[3] As the Court understands the evidence and counsel's arguments, if Carroll continues working until March 2013 and earns 40 credits, thus entitling him to Social Security/Medicare benefits, neither of the plans would reimburse his contributions. In that case, he would not have suffered any harm, because the sole benefit that he complains is lacking from TCP2, but is present in TCP1, is the reimbursement of Social Security/Medicare contributions, which would then also be lacking from TCP1. See Tr. at 7:14-24 (Gordon).

See id.[4]

## PROCEDURAL BACKGROUND

On January 11, 2008, Carroll filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that LANS had discriminated against him on the basis of his age. See Second Amended Complaint for Damages from Violations of ERISA, the Age Discrimination in Employment Act, and Negligent Misrepresentation ¶ 5, at 2, filed July 6, 2009 (Doc. 36)("2d Complaint"). After the EEOC investigated the allegations in the charge, it issued Carroll and his counsel a Notice of Right to Sue. See 2d Complaint ¶ 6-7, at 2. Carroll filed his original complaint in federal court within ninety days of receipt of the Notice. See 2d Complaint ¶ 8, at 2.

Carroll filed the original complaint on October 16, 2008. See Complaint for Damages from Violations of ERISA, the Age Discrimination in Employment Act, and Negligent Misrepresentation, filed October 16, 2008 (Doc. 1). He has since amended his complaint twice. See Amended Complaint for Damages from Violations of ERISA, the Age Discrimination in Employment Act, and Negligent Misrepresentation, filed May 7, 2009 (Doc. 20); 2d Complaint at 1. By that second amendment, Carroll added BIC as a defendant in this action. In all three complaints, Carroll's claims have been basically the same: (1) ERISA violation under sections 1132(a)(1)(A), 1132(a)(1)(B), and 1132(a)(3); (ii) age discrimination in violation of the ADEA; and (iii) negligent misrepresentation. See 2d Complaint ¶¶ 37-59, at 7-11. On December 14, 2009, Carroll stipulated to dismissal of Count II, violation of the ADEA, and to dismissal of his ERISA claim seeking

---

[4] It is unclear from Polito's affidavit whether the TCP1 benefits-package value include the Social Security/Medicare reimbursement payments. If the TCP1 value does not include the payments, then Carroll would be only $116,910.00 better off with TCP2 than with TCP1. If the TCP1 value includes those payments, then he would be $156,910.00 better off with TCP2, according to Polito's calculations. From the attached tables, it appears that the total does not include the reimbursement payments.

instatement into TCP1.  See Stipulation of Partial Dismissal, filed December 14, 2009 (Doc. 54).

        1.        **The Briefs.**

        LANS and BIC now move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all remaining claims in Carroll's Second Amended Complaint. The Defendants argue that: (i) Carroll cannot state a claim under ERISA § 502(a)(1)(A) because the Defendants did not withhold information that ERISA creates a duty to disclose, see Motion at 5-6; (ii) Carroll cannot provide evidence of reliance on the Defendants' misrepresentations, see id. at 6-9; (iii) Carroll cannot provide evidence that any reliance on the Defendants' misrepresentations harmed him, see id. at 7-9; and (iv) Carroll's claims for retirement benefits are not ripe, see id. at 9-12.  On January 5, 20910, Carroll filed his response.  See Plaintiff's Response to Defendants's Motion for Summary Judgment, filed January 5, 2010 (Doc. 57)("Response").   Carroll argues that: (i) misleading, deficient, or deceptive information provided to plan participants is sufficient to create a claim under ERISA § 502, see Response at 7-10; (ii) Carroll has provided evidence of his reliance on the Defendants' misrepresentations, see id. at 11-12; (iii) a claim for negligent misrepresentation under New Mexico law does not require evidence of detrimental reliance, but merely reliance, see id. at 10-14; and (iv) his claim is ripe for adjudication, see id. at 14-16.  The Defendants filed a reply on January 13, 2010.  See Defendants' Reply in Support of Motion for Summary Judgment, filed January 13, 2010 (Doc. 58)("Reply").  The Defendants' reply delineates their arguments regarding Carroll's ERISA claim into three sub-parts: (i) Carroll never requested information regarding an ERISA-governed plan; (ii) even if he the plan were ERISA-governed, the information he requested was not included in the disclosure provision of subchapter I; and (iii) there is no general fiduciary

obligation under ERISA to provide plan information on request.  See Reply at 7.[5]

2.       **Arguments at the Hearing.**

At the hearing, Scott Gordon, the Defendants' attorney, began by conceding that LANS gave Carroll some bad information.   See Transcript of Hearing at 2:16-17 (taken January 28, 2010)("Tr.")(Gordon).[6] Mr. Gordon then reiterated his arguments: (i) that Carroll cannot testify that he would have made a different decision if he had known the truth; (ii) that the Defendants' misrepresentation did not harm Carroll, even if he had relied on it, because he came out financially ahead by at least $100,000.00 by selecting TCP2; and (iii) that Carroll cannot recover because his damages are speculative until he retires; until he retires, one cannot know how much he contributed to Social Security/Medicare that would otherwise have been reimbursed.  See id. at 2:23-6:5 (Gordon).  Mr. Gordon sought to differentiate these future damages from those in a personal-injury or wrongful-death context by arguing that, not only is the amount of Carroll's damages speculative, the existence of any damages at all is speculative.  See id. at 7:14-8:2 (Gordon).  Mr. Gordon likewise reiterated his arguments regarding ERISA -- that the only enforcement provision that Carroll still asserts cannot be used to recover for a breach of ERISA's general fiduciary duty, and that the Social Security/Medicare reimbursements about which Carroll complains are not covered by an ERISA plan.  See id. at 8:3-10:14 (Gordon).

Michael Mozes, Carroll's attorney, argued that the Defendants misunderstand the reliance element of a claim for negligent misrepresentation under New Mexico law and insisted that Carroll

_____

[5] The reply brief also includes a request that, if the Court denies the Defendants' motion, the Court grant the Defendants limited additional discovery on the issue of the sudden change in Carroll's circumstances with respect to his expected retirement date.  See Reply at 12.

[6] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

could rely on a misrepresentation even if he would have made the same decision without the misrepresentation.  See id. at 10:20-12:7 (Mozes)("[T]he appropriate element is, and the appropriate question to ask is, did David Carroll rely on the representation?").  Mr. Mozes went so far as to suggest that the Court can find reliance as a matter of law from the record.  See id. at 12:13-16 (Mozes).  He also reiterated his position that New Mexico law does not require detrimental reliance, but merely reliance, to state a claim for negligence misrepresentation.  See id. at 13:18-15:4 (Court, Mozes).  Mr. Mozes attacked the Defendants' argument that Carroll benefitted from choosing TCP2 by asserting that the calculations on which they rely are speculative in that they assume that Carroll will live until 2027.  See id. at 15:5-17 (Mozes).  He then argued that: (i) Carroll's ERISA claim can be brought based solely on the Defendants' provision of material misinformation and the resultant breach of fiduciary duty, see id. at 21:10-22:6 (Mozes); (ii) the reimbursement plan was part of the ERISA plan and that ERISA applies to it, see id. at 22:7-20 (Mozes); and, (iii) while ERISA does not create a general fiduciary duty to provide plan information, it creates a duty to provide information requested in writing, see id. at 22:21-23:23 (Mozes).

In his rebuttal argument, Mr. Gordon stated that he believes that Carroll's claims will accrue when he finally retires and that is when his claim will be ripe.  See id. at 25:25-26:14 (Gordon).  He explained to the Court that, regardless which plan Carroll chose, the same Social Security/Medicare contributions would be withdrawn from his paycheck; the only issue is whether those payments will be reimbursed in March of 2013.  See id. at 26:6-25 (Court, Gordon).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'").  Nor can a party "avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the Court should keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the Court must resolve all reasonable inferences and doubts in favor

-12-

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any

issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

### RELEVANT LAW OF PRIVATE RIGHTS OF ACTION UNDER ERISA

ERISA provides a uniform regulatory regime over employee-benefit plans and includes

expansive preemption provisions which are intended to ensure that employee-benefit-plan regulation

would be "exclusively a federal concern."  Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004)

(quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)).  There are several civil

enforcement provisions under ERISA.  Those provisions can be put into three general categories:

(i) those found under section 502, 29 U.S.C. § 1132; (ii) those found under section 409, 29 U.S.C.

§ 1109; and (iii) miscellaneous provisions found elsewhere in ERISA.  See 1 L. Polk, ERISA Prac.

& Litig § 5:3.  This case deals only with a claim for a civil penalty under § 501(a)(1)(A) and §

501(c).[7]

### 1.    ERISA's Penalty Provisions Apply Only in Limited Circumstances.

ERISA's private-enforcement provisions are elaborate and indicate a preference for certain

remedies over others.  Compared to the other available enforcement mechanisms under § 502(a)

---

[7] As the Court understands the parties' positions, Carroll has dismissed his third claim under Count I, which sought equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for instatement into TCP1.  See Stipulation of Partial Dismissal at 1.  That dismissal leaves only: (i) Carroll's claim under ERISA § 502(a)(1)(A), alleging that BIC and LANS failed to provide requested information, which is punishable by a penalty of up to $110 per day; and (ii) his claim under ERISA § 502(a)(1)(B), also related to the plan administrator's failure to provide requested information.  Carroll has admitted, however, that he is not making a claim for benefits under § 502(a)(1)(B).  See Reply at 1-2; Plaintiff's Response to Defendant's Motion to Dismiss, filed February 6, 2009 (Doc. 10)("Carroll makes no claims for benefits related to a benefit plan [because] the plan Carroll is enrolled in . . . has no provision for reimbursement of Social Security/Medicare benefits.").

available to plan participants, § 502(a)(1)(A) appears the most limited.  Section 502(a)(1)(B) allows a participant to bring a civil action to recover benefits due, enforce rights, or clarify rights under the plan.  See 29 U.S.C. § 1132(a)(1)(B).  Section 502(a)(3) authorizes a participant to receive an injunction or other equitable relief for any violation of ERISA subchapter I or the terms of the benefit plan.  See 29 U.S.C. § 1132(a)(3).  Section 502(a)(1)(A) provides that a plan participant may bring a civil action "for the relief provided for in subsection (c) of this section."  29 U.S.C. § 1132(a)(1)(A).

Section 502(c) deals with an "[a]dministrator's refusal to supply requested information." 29 U.S.C. § 1132(c).  Each of its subsections set forth a situation in which a penalty may be imposed against -- depending upon which subsection is at issue -- a plan administrator, an employer, or other person.  Most of the subsections of 502(c), however, allow only the Secretary of Labor to level the penalty against the offending person.  See 29 U.S.C. 1132(c)(2), (4), (5), (6), (7), (8), (9), (10). Those subsections of § 502(c) that apparently may be brought by a plan participant are § 502(c)(1)(A), (c)(1)(B), and (c)(3).  Section 502(c)(1)(A) provides that a penalty of up to $110 per day can be leveled against a plan administrator that fails to meet the requirements of § 1166(1), § 1166(4),[8] § 1021(e)(1), § 1021(f), or § 1025(a) of Title 29.  See 29 U.S.C. § 1132(c)(1)(A); 29 C.F.R. § 2575.502c-1 (raising the maximum daily fine from $100.00 to $110.00).  None of those sections appear related to Carroll's request for information regarding Social Security/Medicare

---

[8] It appears that this provisions now refer to 29 U.S.C. §§ 1166(a)(1) and 1166(a)(4), as there is no paragraph (1) or (4) directly under 29 U.S.C. § 1166.  See 29 U.S.C.A. § 1166 (noting that the 1989 amendment to this section "designated existing first sentence as subsec. '(a) In general'" and added subsections (b) and (c)).

reimbursement.[9]  Section 502(c)(3) provides that the penalty can be leveled against an employer who fails to satisfy § 1021(d), § 1021(e)(1), § 1021(e)(2), or § 1082(d)(12)(E) of Title 29.  See 29 U.S.C. § 1132(c)(3); 29 C.F.R. § 2575.502c-3.  Again, none of these subsections relate to Carroll's inquiries regarding the fate of his Social Security/Medicare contributions.[10]

Section 502(c)(1)(B) is the most broad of the penalty provisions that is available to plan participants.  It allows a court to assess a penalty against any plan administrator that "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator)."  29 U.S.C. § 1132(c)(1)(B).  The question thus arises: what information does subchapter I require a plan administrator to furnish to a participant upon request?

### 2.    Case Law Recognizes the Limited Scope of Claims for Penalties Under § 502(c).

A number of courts have noted the limited nature of the penalty provisions of § 502(c) of ERISA.  The United States Court of Appeals for the Tenth Circuit addressed claims under this provision in Moothart v. Bell, 21 F.3d 1499 (10th Cir. 1994).  The Tenth Circuit noted that "Section 1132(c) [a/k/a ERISA § 502(c)] is the penalty provision applicable where the court finds a violation

_____

[9] 29 U.S.C. §§ 1166(1) and 1166(4) relate to disclosure of "qualifying events," 29 U.S.C. § 1021(e)(1) relates to notice to participants of a transfer of excess pension assets, 29 U.S.C. § 1021(f) relates to the provision of a "plan funding notice" for defined benefit plans, and 29 U.S.C. § 1025(a) relates to provision of "pension benefit statements."

[10] 29 U.S.C. § 1021(d) relates to notices of a failure to meet minimum funding standards, and 29 U.S.C. §§ 1021(e)(1) and 29 U.S.C. § 1021(e)(2) relate to notice to "participants," "Secretaries, administrators, and employee organizations" of transfers of excess pension assets.  29 U.S.C. § 1082(d) contains miscellaneous rules and, because of amendment, no longer contains a subsection (d)(12).  See Allen v. Garden City Co-op, Inc., 641 F. Supp. 2d 1249, 1266 n.83 (D. Kan. 2009)("Section 1082(d)(12)(E) is no longer in existence.").

of [29 U.S.C.] § 1024." <u>Moothart v. Bell</u>, 21 F.3d at 1503.  This statement implies that it is § 1024, and perhaps other sections, which provides the duty to furnish particular documents upon request, and which is enforceable by the penalty outlined in § 502(c)(1)(B), 29 U.S.C. § 1132(c).  That interpretation is consistent with the plain language of the statute, which provides that a private individual can bring a civil suit to enforce the penalty against any plan administrator "who fails or refuses to comply with a request for any information <u>which such administrator is required by this subchapter to furnish</u> to a participant."  29 U.S.C. 1132(c)(1)(B) (emphasis added).  The Tenth Circuit also noted that imposition of the penalties outlined in § 502(c) is discretionary and would only be disturbed if that discretion was abused.  <u>See</u> 21 F.3d at 1504-05.  <u>See also</u> <u>Moore v. LaFayette Life Ins. Co.</u>, 458 F.3d 416, 437 (6th Cir. 2006)(affirming a district court's discretion to refuse to assess the penalty, even when the defendant violated 29 U.S.C. § 1024(b)(4)).

The United States Court of Appeals for the Seventh Circuit, in <u>Wilczynski v. Lumbermens Mutual Casualty Co.</u>, 93 F.3d 397 (7th Cir. 1996), held that § 502(c) penalties can be assessed only for conduct that breaches an administrator's duty of disclosure created by ERISA subchapter I; violations of regulations promulgated thereunder will not suffice.  <u>See</u> 93 F.3d at 405-07 (holding that the penalty provision of section 502(c) did not apply because the duty allegedly violated was: (i) placed on plans and not administrators; and (ii) created by regulation and not by statute).  The Seventh Circuit has also held that the penalties of § 502(c) are relatively narrow, and refused to assess penalties where an ERISA administrator failed to fill out its portion of a long-term disability claim form because the claim form was not a document that the administrator "is required by this subchapter to furnish to a participant" under 29 U.S.C. § 1024.  <u>Allinder v. Inter-City Prods. Corp.</u>, 152 F.3d 544, 548 (6th Cir. 1998).  The United States Court of Appeals for the Fourth Circuit appears to be in agreement, stating: "Under ERISA § 502(c)(1), a district court may, in its discretion,

-16-

assess penalties of up to $100 a day against plan administrators who fail to furnish requested documents that are required to be furnished by § 104(b)(4)[a/k/a 29 U.S.C. 1024(b)(4)]." Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir. 1996)(upholding a $2500 penalty and remanding to determine whether an additional penalty should be assessed). See Christensen v. Qwest Pension Plan, 462 F.3d 913 (8th Cir. 2006)("ERISA provides that pension plan administrators 'shall furnish' a statement of the total plan benefits accrued to any participant 'who so requests in writing.' An administrator who fails to comply 'may in the court's discretion be personally liable' to the requesting participant for a statutory liability of up to $100 a day.").

As the Honorable William S. Duffey, Jr., United States District Judge for the Northern District of Georgia, noted:

> Section [502(c), 29 U.S.C. §] 1132(c), by its plain language, addresses only an administrator's failure or refusal to provide information "which [the] administrator is required by this subchapter to furnish to a participant or beneficiary." 29 U.S.C. § 1132(c). The section's phrase "under this subchapter" (i.e., ERISA) clearly embraces an administrator's failure or refusal to provide the documents identified in Section 1024, namely "the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." See 29 U.S.C. § 1024(b)(4). The source of the Coca-Cola Defendants' obligation to provide Plaintiff copies of documents "relevant" or "pertinent" to her claim is outside the statute. To the extent claims-related documents are required to be provided, the obligation arises by federal regulation. See 29 C.F.R. § 2560.503-1(g) (2000).

Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193, 1211 (N.D. Ga. 2005)(declining to impose the civil penalty for failure to provide "claims manuals, claims guidelines, CV's, medical record reviews, etc."). Judge Duffey concluded that, "[i]n the absence of Eleventh Circuit authority on this issue, the Court declines to rewrite Section 1132(c) to authorize statutory penalties against an administrator for failure to provide documents other than those identified in the statute itself." Brucks v. Coca-Cola Co., 391 F. Supp. 2d at 1212.

-17-

The Honorable Dudley H. Bowen, Jr., Senior United States District Judge for the Southern District of Georgia, then Chief Judge, held similarly in McNutt v. J.A. Jones Construction Co., 33 F. Supp. 2d 1375 (S.D. Ga. 1998).  In McNutt v. J.A. Jones Construction Co., the plaintiff sought to recover under the civil penalty provision "because Defendant Jones did not provide him with the forms necessary for him to file his disability claim."  33 F. Supp. 2d at 1381.  Judge Bowen rejected this argument, finding that "ERISA contains a comprehensive list of documents administrators must provide.  29 U.S.C. § 1024(b)(4).  Claim forms are not among the documents listed under the statute that must be provided to plan participants."  33 F. Supp. 2d at 1382.  He rejected the plaintiff's argument that "a penalty should be assessed for failure to furnish claim forms because these forms are such an integral part of the management and administration of the plan."  33 F. Supp. 2d at 1382.  "Because Congress has not explicitly provided a statutory penalty for a plan administrator's failure to provide a claims form," Judge Bowen "decline[d] to extend the statute to allow Plaintiff's ERISA claim for a statutory penalty to proceed."  33 F. Supp. 2d at 1382.

The United States Court of Appeals for the Third Circuit has held that the connection between the ERISA provision that creates a general fiduciary duty and the provisions that provide for penalties for failure to provide required plan information is "too tenuous" to allow a penalty to be assessed for a breach of fiduciary duty.  Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 147 (3d Cir. 2007).  In Kollman v. Hewitt Assocs., LLC, the plaintiff brought claims under ERISA's fiduciary duty provision and § 502(c), arguing

> that because the Plan states that a claimant is entitled to copies "of all documents, records and other information relevant to the claim," the failure to produce the Plan and the [summary plan description] violated [the defendants'] fiduciary duty under § 404(a)(1)(D) of ERISA, thereby incurring the penalty assessed under § 502(c)(1) of ERISA.

487 F.3d at 146.  The Third Circuit held, however, that "Section 404(a)(1)(D) [the fiduciary-duty

provision] does not contain language that directly imposes information obligations on plan administrators."  487 F.3d at 147.  Rather, the Third Circuit recalled that it had previously stated

> that liability under § 502(c) "can be imposed on plan administrators only if they fail to fulfill an obligation [that] ERISA imposes directly upon them," and that "§ 502(c) subjects plan administrators to liability only for failure or refusal to release the information that Subchapter 1 of ERISA specifically requires plan administrators to release."

487 F.3d at 147 (quoting <u>Groves v. Modified Ret. Plan for Hourly Paid Employees of Johns Manville Corp. & Subs.</u>, 803 F.2d 109 (3d Cir. 1986)).  The Third Circuit thus affirmed the district court's refusal to impose the penalty for violation of the fiduciary duty provision.  <u>See</u> <u>Kollman v. Hewitt Assocs., LLC</u>, 487 F.3d at 144, 147.[11]

### 3.    <u>Duties to Provide Requested Information in 29 U.S.C. § 1024.</u>

Section 104 of ERISA, 29 U.S.C. § 1024, is entitled "Filing with Secretary and furnishing information to participants and certain employees."  It contains several lists of documents and information about when those documents must be provided, and to whom.  It is reasonable to conclude, as did the sources above, that Section 104 lists the documents that an "administrator is required by this subchapter to furnish to a participant or beneficiary."  29 U.S.C. § 1132(c)(1)(B).  It is therefore only for a failure to provide these documents under the circumstances described that a court can impose the penalty described in Section 502(c)(1)(B).  Subsection (b)(4) lists the documents that a plan administrator has a duty to provide upon written request:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, [sic] plan description, and the latest

---

[11] The Third Circuit ultimately reversed the district court's imposition of the penalty because it found that the district court's finding that the defendants violated 29 U.S.C. § 1024(b)(4) was in error.  <u>See</u> <u>Kollman v. Hewitt Assocs., LLC</u>, 487 F.3d at 146-47 ("[W]e hold that the District Court's finding that Kollman's request was sufficiently specific under the clear notice test was clearly erroneous.").

annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.  The administrator may make a reasonable charge to cover the cost of furnishing such complete copies.  The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4).  It therefore appears that the plan administrator can be held liable for the statutory penalty of § 502(c) only where a plan administrator refuses to supply, upon request: (i) a summary plan description; (ii) the latest annual report; (iii) any terminal report; or (iv) the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.  Failure to supply other requested documents, if some section of subchapter I of ERISA requires the plan administrator to supply them, can also give rise to ERISA liability under §§ 502(a)(1)(A) and 502(c)(1)(B).  See Christensen v. Qwest Pension Plan, 462 F.3d at 918-19 (holding that a telephone request for an estimate of benefits did not constitute a request for a statement of benefits accrued under 29 U.S.C. § 1025(a), and that therefore the penalty provision did not apply).[12]  The thrust of the penalty provision, however, is that plan administrators shall furnish, upon request, documents that some section of subchapter I requires them to furnish.  It does not provide that plan administrators will be personally liable for the penalty upon any and all wrongful conduct.

## NEW MEXICO LAW OF NEGLIGENT MISREPRESENTATION

New Mexico follows the Restatement (Second) of Torts ("RST") with regard to what a plaintiff must prove to succeed on a negligent-misrepresentation claim.  See First Interstate Bank

---

[12] The United States Court of Appeals for the Eighth Circuit also held that, even if the plan administrators had technically violated 29 U.S.C. § 1025(a), the district court had not abused its discretion in declining to impose the penalty.  See Christensen v. Qwest Pension Plan, 462 F.3d at 919 ("We further conclude that the district court did not abuse its discretion in declining to impose a penalty, even if § 1025(a) was technically violated.").

of Gallup v. Foutz, 107 N.M. 749, 750-51, 764 P.3d 1307, 1308-09 (1988)("Because New Mexico

follows the tort of negligent misrepresentation as set forth in the Restatement, it is not unreasonable

to conclude that we would also follow the damages as set forth therein."); Stotlar v. Hester, 92 N.M.

26, 29, 582 P.2d 403, 406 (Ct. App. 1978).  The RST sets forth the cause of action as follows:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RST § 552 (1977).  The New Mexico pattern jury instruction for negligent misrepresentation

delineates the elements:

> A party is liable for damages caused by his negligent and material misrepresentation.
>
> A material misrepresentation is an untrue statement which a party intends the other party to rely on and upon which the other party did in fact rely.
>
> A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement was true.

NMRA UJI 13-1632, at 230 (2008).

The thrust of both the RST and the pattern instruction is the same.  For a claimant to state

a cause of action for negligent misrepresentation, he or she must establish five elements[13]: (i) an

---

[13] The RST appears to have one additional requirement, that the misrepresentation be made "in the course of [the defendant's] business, profession, or employment, or in any other transaction in which he has a pecuniary interest."  RST § 552.  This inconsistency between the RST and the pattern jury instructions need not cause the Court pause, however, because no party argues that the misrepresentation at issue in this case was made outside the course of the Defendants' business, profession, or employment, or in a transaction in which the Defendants did not have a pecuniary interest.  The RST also places limits upon who may be a plaintiff in such an action, but Carroll satisfies this limitation as well.  RST § 552(2) states:

> [T]he liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to

untrue statement, <u>see</u> NMRA UJI 13-1632, at 230 ("A material misrepresentation is an untrue statement . . . ."); RST § 552 ("One who . . . supplies false information"); (ii) made by one who has no reasonable ground for believing the statement was true, <u>see</u> NMRA UJI 13-1632, at 230 ("A negligent misrepresentation is one where the speaker has no reasonable grounds for believing that the statement was true."); RST § 552 ("[I]f he fails to exercise reasonable care or competence in obtaining or communicating the information."); (iii) on which the speaker intends the listener to rely, <u>see</u> NMRA UJI 13-1632, at 230 ("A material misrepresentation is an untrue statement which a party intends the other party to rely on . . . ."); RST § 552 ("One who . . . supplies false information for the guidance of others in their business transactions . . . ."); (iv) and on which the listener relied, <u>see</u> NMRA UJI 13-1632, at 230 (". . . and upon which the other party did in fact rely."); RST § 552 (". . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . . ."); and (v) such reliance caused harm to the listener, <u>see</u> NMRA UJI 13-1632, at 230 ("A party is liable for damages caused by . . . ."); RST § 552 (". . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information[.]").

Some cases from New Mexico courts have failed to enumerate injury or detriment as an element of a claim for negligent misrepresentation.  <u>See</u>, <u>e.g.</u>, <u>Saylor v. Valles</u>, 133 N.M. 432, 438, 63 P.3d 1152, 1158 (Ct. App. 2002)(listing four elements of negligent misrepresentation: (i) a material misrepresentation; (ii) reliance; (iii) the defendant's recklessness or knowledge of falsity; and (iv) intent to induce reliance)(citing <u>Parker v. E.I. DuPont de Nemours & Co.</u>, 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct. App. 1995)).  The cases acknowledge, however, that "[p]rincples of

supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

negligence govern the law of negligent misrepresentation." Saylor v. Valles, 133 N.M. at 438, 63 P.3d at 1158. See Ledbetter v. Webb, 103 N.M. 597, 602, 711 P.2d 874, 879 (1985)(distinguishing negligent misrepresentation from the intentional torts of fraud or deceit). And it is well established that harm is one of the core elements of a claim of negligence. See N.M. Pub. Schs. Ins. Auth. v. Arthur J. Gallagher & Co., 145 N.M. 316, 327-28, 198 P.3d 342, 353-54 (2008); Spurlin v. Paul Brown Agency, Inc., 80 N.M. 306, 307, 454 P.2d 963, 964 (1969)("[T]here was no cause of action for negligence until there had been a resulting injury.").

## ANALYSIS

The Defendants move for summary judgment on both of Carroll's claims. Regarding Carroll's ERISA claim, the Defendants argue that ERISA does not create a duty to disclose the information that Carroll requested and thus that the penalty provision of ERISA § 502(a)(1)(A) does not apply to the Defendants' conduct. The Defendants then argue that Carroll's negligent misrepresentation claim must fail because: (i) Carroll's deposition testimony establishes that he did not rely on the Defendants' misrepresentation; (ii) because the evidence shows that Carroll will suffer no injury from the misrepresentation; and (iii) Carroll's claim is not ripe because, even if Carroll is eventually harmed by electing TCP2, such harm will not occur until Carroll retires and does not receive reimbursement of his Social Security/Medicare benefits. Carroll contests each of the Defendants' arguments. Ultimately, the Court grants the Defendants' motion.

## I.   BECAUSE OF THE REMEDY CARROLL SEEKS, CARROLL CANNOT ESTABLISH AN ERISA CLAIM.

Carroll seeks only one remedy by his ERISA claim: the penalty that is available for certain conduct under § 502(c), for which § 502(a)(1)(A) allows a participant or beneficiary to bring suit. See 29 U.S.C. § 1132(a)(1)(A). The Defendants move for summary judgment on several grounds,

which they concisely summarize in their reply brief:

> Thus, [Carroll]'s § 1132(c) claim fails for three reasons: (1) he never requested information regarding an ERISA plan; (2) even if he had, the information he requested was not specifically required to be furnished under ERISA subchapter I; and (3) "the cases do not recognize a general fiduciary obligation under ERISA to provide information related to the plan on request[.]"

Reply at 7. Carroll rejects these arguments, arguing that "misleading, deficient, or deceptive information provided to plan participants may give rise to claims of fiduciary breach under ERISA." Response at 7 (citing cases). He insists that a plan administrator has a fiduciary duty to plan participants above and beyond the duty to supply particular documents to them upon request. See Response at 7. The Court does not disagree with Carroll, but finds that the remedy he seeks -- imposition of the statutory penalty of § 502(c) -- is available only in the limited situations outlined in that subsection and not for general breaches of fiduciary duty. Because the § 502(c) penalty is the only remedy he seeks, and because he does not allege conduct under which he can bring a claim for the penalty, the Court will grant the Defendants' motion for summary judgment as to Carroll's ERISA claim.

Carroll alleges only one category of wrongful conduct under which he seeks to bring his ERISA claim: after a series of verbal and e-mail inquiries whether TCP2 participants would be eligible for reimbursement of their Social Security/Medicare contributions, one of the Defendants' employees erroneously told him that the answer was "Yes." 2d Complaint ¶¶ 21-31, at 4-6. Taking this response into consideration, Carroll selected TCP2, only to later learn that TCP2 participants would not be eligible for such reimbursements.[14] Carroll now brings this suit seeking recovery of

---

[14] As will be explained in more detail below, even under TCP1, Social Security/Medicare contributions would be reimbursed only if the participant eventually retired without becoming eligible for Social Security/Medicare benefits.

his Social Security/Medicare contributions under a theory of negligent misrepresentation, but has explained that he is not seeking benefits of which he was deprived under § 502(a)(1)(B), nor does he seek instatement into TCP1 as an equitable remedy under § 502(a)(3).

Section 502(c)(1)(B) provides for imposition of a penalty of $110 per day if a plan administrator "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary."  29 U.S.C. § 1132(c)(1)(B).  Carroll has failed to point the Court to any part of ERISA that explicitly requires the plan administrator to furnish him with the answer to his question about the fate of his Social Security/Medicare contributions.  The Defendants and several courts have asserted that the only section of ERISA the violation of which will give rise to a potential penalty under § 502(c)(1)(B) is § 104, 29 U.S.C. § 1024.  See Allinder v. Inter-City Prods. Corp., 152 F.3d at 548; Faircloth v. Lundy Packing, 91 F.3d at 659 ("Under ERISA § 502(c)(1), a district court may, in its discretion, assess penalties of up to $100 a day against plan administrators who fail to furnish requested documents that are required to be furnished by § 104(b)(4)."); Moothart v. Bell, 21 F.3d at 1503 ("Section 1132(c)(1) is the penalty provision applicable where the court finds a violation of § 1024."); Motion at 5-6; Reply at 2-3.  In Brucks v. Coca-Cola Co., Judge Duffey stated:

> Section 1132(c), by its plain language, addresses only an administrator's failure or refusal to provide information "which [the] administrator is required by this subchapter to furnish to a participant or beneficiary."  29 U.S.C. § 1132(c).  The section's phrase "under this subchapter" (i.e., ERISA) clearly embraces an administrator's failure or refusal to provide the documents identified in Section 1024[.]

391 F. Supp. 2d at 1211.  See McNutt v. J.A. Jones Constr. Co., 33 F. Supp. 2d at 1381-82 ("ERISA provides statutory penalties against plan administrators who refuse to comply with requests for information that ERISA requires administrators to provide [and] contains a comprehensive list of

documents administrators must provide.")(citing 29 U.S.C. § 1024(b)(4)).  Section 1024 requires that the administrator, on request, furnish the participant only with: (i) a summary plan description; (ii) the latest annual report; (iii) any terminal report; or (iv) the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated.  See 29 U.S.C. 1024(b)(4).  Carroll has testified that he is not seeking any of these four categories of documents.  See Carroll Depo. at 89:13-91:11.[15]

The statute's plain language suggests that the conduct under which a beneficiary can recover the statutory penalties are limited.  Again, the provisions creating private remedies under § 502 are § 502(a)(1)(A), § 502(a)(1)(B), and § 502(a)(3).  Section 502(a)(1)(B) allowing a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  That provision, though broadly worded in a way, is highly circumscribed in terms of the remedy available -- the claimant may receive benefits due him or her, rights due him or her, or information.  Section 502(a)(3) allows "a participant, beneficiary, or fiduciary" to bring an action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," or to "obtain other appropriate equitable relief."  Again, though the conduct affected is potentially broad -- any act or practice which violates any provision of this subchapter or the terms of the plan -- the remedy is circumscribed.  The claimant can secure only an injunction or other appropriate equitable relief -- absent special circumstances, the claimant cannot recover money.  See Mertens v. Hewitt Assocs., 508 U.S. 248,

---

[15] Even if other sections of ERISA subchapter I, such as 29 U.S.C. § 1025, also create a duty to disclose certain plan documents upon request, see Christensen v. Qwest Pension Plan, 462 F.3d at 918-19, Carroll has not alleged that the Defendants failed to satisfy any particular one of them.

255 (1995)(holding that "other appropriate equitable relief" generally does not include compensatory or punitive damages). Similarly, the penalty that Congress provided in § 502(c)(1)(B) is circumscribed in certain respects. It provides that the penalty will be imposed on any administrator "who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary." The phrase "required by this subchapter to furnish" indicates that the claimant must specify a section of ERISA subchapter I that explicitly imposes a duty upon an administrator to provide certain information. 29 U.S.C. § 1132(c)(1)(B) (emphasis added). A review of ERISA provisions in subchapter I reveals 29 U.S.C. § 1024, entitled "Filing with Secretary and furnishing information to participants and certain employees," which places a duty upon plan administrators to furnish certain information, and subsection (4), which creates a duty to provide certain plan documents to a participant upon request. 29 U.S.C. § 1024(b)(4).

It thus appears that the penalty of § 502(c) is not available for all breaches of fiduciary duty by a plan administrator or fiduciary. See Kollman v. Hewitt Assocs., LLC, 487 F.3d at 147 (holding that the fiduciary duty imposed by § 404(a)(1)(D) does not impose a duty to provide information that can give rise to a penalty under § 502(c)(1)). Its use is more circumscribed. That result makes sense given the congressional purpose behind ERISA -- to ensure that employees are treated fairly and receive appropriate benefits. See 29 U.S.C. § 1001(b) ("It is hereby declared to be the policy of this chapter to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . ."); 29 U.S.C. § 1001(c)("It is hereby further declared to be the policy of this chapter to protect . . . the interests of participants in private pension plans and their beneficiaries . . . ."). Such policy is furthered better by broadly allowing actions for benefits due and for equitable remedies, such as instatement into a different plan if the employee was deceived as to

the terms of the plans available to him.  Carroll, however, does not seek any such equitable remedy -- likely because he has concluded that, although his decision to select TCP2 was not fully informed, TCP2 was ultimately the superior plan for him.  The Court does not condone the Defendants' act -- accidental or not -- of providing the wrong answer to a prospective plan participant's question about a policy detail.  The Court finds, however, that such conduct is outside the scope of ERISA's penalty provision.  In short, assuming, without deciding, that the Defendants breached a fiduciary duty in providing incorrect information to Carroll in response to an inquiry about the details of a retirement plan, the Court finds that ERISA does not provide for a per diem penalty for such a general fiduciary breach.[16]

The cases Carroll cites to the Court are not to the contrary.  None of the cases Carroll cites

---

[16] Because the Court finds that the only ERISA remedy that Carroll seeks is unavailable for the conduct about which he complains, the Court does not address the Defendants' alternative argument, that the Social Security/Medicare reimbursement policy was not part of an ERISA plan. See Reply at 7.  The Court is concerned, however, by the exceedingly broad definition of "employee benefit plan" in 29 U.S.C. § 1002(1), (2), and (3).  An employee pension benefit plan, which is included in the definition of an employee benefit plan, describes

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond

29 U.S.C. § 1002(2)(A).  The provision includes some exceptions, but those exceptions state only that some things which might otherwise be considered pension benefit plans will be considered welfare benefit plans -- both of which fall under the general rubric of "employee benefit plans."  29 U.S.C. §§ 1002(2)(B), 1002(3).  The Social Security/Medicare reimbursement policy might fall under that definition, and the Defendants have provided the Court nothing but the testimony of Polito to show that the reimbursement policy is not governed by ERISA.  See Schultz v. UnumProvident Corp., No. 06-CV-622-GKF-PJC, 2009 U.S. Dist. LEXIS 13501, at **14-16 (N.D. Okla. Feb. 20, 2009)(describing the safe harbor provision for exclusion from ERISA).  Nevertheless, the Court declines to reach the legal question whether ERISA governs the reimbursement policy.

that deal with breach of fiduciary duty impose the statutory penalty as the remedy.  See Varity Corp. v. Howe, 516 U.S. 489, 506 (1996)(reviewing a private action under 29 U.S.C. § 1132(a)(3) and not for the penalty under 29 U.S.C. § 1132(c)); Mathews v. Chevron Corp., 362 F.3d 1172, 1176 (9th Cir. 2004)("At issue here is an alleged violation of section 404(a)(1) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1104(a)(1), and the equitable relief awarded pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3)."); Horn v. Cendant Ops., Inc., 69 Fed. Appx. 421, 425-26 (10th Cir. 2003)(reviewing a claim for benefits, not mentioning the penalty provision); Binns v. Exxon Co., 220 F.3d 1042, 1047-48 (9th Cir. 2000)(dealing with a claim of breach of fiduciary duty under 29 U.S.C. § 1104(a)(1) and not discussing the penalty provisions); Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 7 (2d Cir. 1997)(not discussing the penalty provision where the plaintiff alleged violation of 29 U.S.C. §§ 1022 and 1024); Jordan v. Fed. Express Corp., 116 F.3d 1005, 1009 n.8, 1010 (3d Cir. 1997)(comparing § 502(a)(1)(B) and § 502(a)(3), but not discussing § 502(a)(1)(A) or § 502(c));[17] Sprague v. Gen. Motors Corp., 92 F.3d 1425, 1441-42 (6th Cir. 1996)(dealing with breach of fiduciary duty claims under 29 U.S.C. § 1104 and not mentioning the penalty provisions); Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1174 (3d Cir. 1996)(discussing the fiduciary duty under 29 U.S.C. § 1104 and not mentioning the statutory penalty provision); Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 235-39 (3d Cir. 1994)(discussing an equitable estoppel claim under 29 U.S.C. § 1132(a)(3)(B) and breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1109, but not discussing the penalty provision); Bixler v. Central Penn. Teamsters Health & Welfare Fund, 12

_____

[17] The Third Circuit mentioned in a separate footnote that, in a prior case, "we found that Congress provided other viable routes for the prosecution of the statutory disclosure violations under § 502(a)(1)(A) or § 502(a)(4)."  Jordan v. Fed. Express Corp., 116 F.3d at 1011 n.10 (emphasis added).

F.3d 1292, 1296-99 (3d Cir. 1993) (discussing the scope of relief for a claim under § 502(a)(3) and § 502(a)(1)(B), but not § 502(a)(1)(A) or § 502(c)); Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 132 (3d Cir. 1993)(plaintiffs claimed violations of §§ 404 and 510); Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 750 (D.C. Cir. 1990).[18] The only case that Carroll cited that addresses a claim for a § 502(c) penalty, and which the Court has not already discussed, is Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923 (3d Cir. 1985), in which the plaintiff sought the penalty for a violation of § 105(a) of ERISA, 29 U.S.C. § 1025(a), which provides a statutory duty to provide an accounting upon request.  See 752 F.2d at 927.  The accounting is information that the administrator "is required by this subchapter to furnish."  29 U.S.C. §§ 1132(c)(1)(B), 1025(a).  None of these cases is inconsistent with the analysis the Court has set forth, nor has the Court come across any such inconsistent cases.

Furthermore, the Court notes that the imposition of a statutory penalty under § 502(c) is discretionary.  See Moothart v. Bell, 21 F.3d at 1504.[19]  In this case, although Ms. Greening provided some incorrect information to a handful of LANS employees regarding the details of TCP2's Social Security/Medicare-reimbursement policy, it occurred during a time of transition between the

---

[18] Carroll cited one Tenth Circuit case that makes a statement, in dicta, which might be broadly construed as implying that requests for documents other than those specified in 29 U.S.C. § 1024 give rise to a claim for the statutory penalty under § 502(c)(1)(B).  See Sage v. Automation Inc. Pension Plan & Trust, 845 F.2d 885, 894 n.4 (10th Cir. 1988).  The plaintiffs in Sage v. Automation Inc. Pension Plan & Trust did not seek the penalty, but the Tenth Circuit commented in a footnote that "29 U.S.C. § 1132(c) . . . provides that a district court may award up to $100 per day for failure to provide plan documents."  845 F.2d at 894 n.4.  Nevertheless, that an administrator's duty to provide documents may arise from sections other than § 1024(b)(4) is not inconsistent with the Court's holding that the duty must arise from some section of ERISA.

[19] Apparently, a court's decision whether to impose the statutory penalty will be overturned only if it is "'arbitrary, capricious or whimsical,' or results in a 'manifestly unreasonable judgment.'"  Moothart v. Bell, 21 F.3d at 1504-05 (quoting United States v. Wright, 826 F.2d 938, 943 (10th Cir. 1987)).

University of California's and LANS' management of LANL.  It appears from all the evidence provided to the Court that it was unintentional and that the individuals involved sought to provide complete and truthful responses to employees' questions as they arose.  While such absence of bad faith might not influence the Court's conclusion if Carroll sought an equitable remedy under 502(a)(3) or, under 502(a)(1)(B), for benefits from a plan that he has been denied, the Court cannot ignore that Carroll complains only of receiving a piece of misinformation that factored in to his decision to choose TCP2.  Carroll does not seek to be reassigned to TCP1 and refused to testify during his deposition that he would have selected TCP1 if he had been given the correct information. It is therefore uncertain whether Carroll has been harmed at all by this oversight.[20]  The Court is concerned that imposition of the statutory penalty would allow Carroll to financially gain from a mistake that did not cause him any calculable harm, and the results of which he does not wish to have undone.[21]  The Court would not assess the statutory penalty even if the penalty provision applied to the Defendants' conduct.

## II.   CARROLL'S NEGLIGENT-MISREPRESENTATION CLAIM FAILS BECAUSE HE HAS NOT, AND WILL NOT, SUFFER ANY HARM.

The Defendants concede that one of their employees supplied Carroll with incorrect information.  The Defendants nevertheless present several arguments in opposition to Carroll's claim of negligent misrepresentation.  First, they insist that Carroll's deposition testimony establishes that he has no evidence of reliance upon any misrepresentation.  Next, they argue that

---

[20] The Court realizes that harm to the participant is not a requirement for imposition of the penalty, see Moothart v. Bell, 21 F.3d at 1504-05, but the Court nevertheless considers it in its holistic determination whether imposition of the penalty is appropriate.

[21] As the Court will explain, there is no evidence that Carroll's election of TCP2 is even truly a result of the Defendants' misinformation.

the misrepresentation did not and will not harm Carroll, because he will come out financially ahead under TCP2.  Third, the Defendants argue that Carroll's claim is not yet ripe because the harm of which he complains may never occur and, until he retires, the quantity of his damages will be speculative.  While the Court finds that Carroll may have created a factual issue regarding reliance, he has not created a factual issue regarding causation and cannot yet -- and will never be able to -- establish damages.

### A.       CARROLL'S CLAIM IS RIPE AND HAS ACCRUED.

As an initial matter, the Court must deal with the Defendants' allegation that Carroll's claim is not yet "ripe," Motion at 9-12; Tr. at 7:25-8:2 (Gordon), because constitutional ripeness is a jurisdictional issue with which the Court must deal before it addresses the merits, see Tarrant Reg'l Water Dist. v. Sevenoaks, 545 F.3d 906, 910 (10th Cir. 2008).  The Court finds that the claims are ripe in the constitutional sense because Carroll suffered a legally cognizable injury when he was given incorrect information regarding the parameters of TCP2 and allegedly elected TCP2 using that incorrect information.  The Court thus has jurisdiction to reach the merits of Carroll's negligent misrepresentation claim.

The Court's jurisdiction, as a federal district court, is limited to cases or controversies under Article III of the Constitution of the United States.  See Garcia v. Bd. of Educ., 520 F.3d 1116, 1123 (10th Cir. 2008).  That means that "the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Tarrant Reg'l Water Dist. v. Sevenoaks, 545 F.3d at 910 (quoting Spencer v. Kemna, 523 U.S. 1, 7 (1998)). These requirements are met where a plaintiff alleges that he was given false information and, based on that, made a decision that detrimentally affected him.  Granted, the Defendants allege that he suffered no harm by the decision, but that argument goes to the merits of Carroll's claim.  The

Defendants further argue that, if Carroll were to suffer financial harm, he will not suffer it until he retires.  That may be true, but at the jurisdictional stage, when Carroll alleges harm, the Court must assume that he has been harmed, and not refuse to decide the case for lack of jurisdiction after it effectively decides the merits.   Moreover, the Supreme Court has acknowledged that, for justiciability purposes -- specifically, the standing inquiry -- harm need only be to some legally protected interest.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Carroll has a legally protected interest in being given correct information regarding his pension-plan options and in making a fully informed selection.  For instance, § 502(a)(3) of ERISA creates a cause of action that might entitle Carroll to equitable relief for the conduct about which he complains.  If Carroll desired, he could be asserting a claim under § 502(a)(3) and asking that the Court use its equitable power to place him in TCP1.  Because Carroll has a legally protected interest in receiving accurate information, and there is no dispute he did not receive accurate information, the Court concludes that the claim is ripe for adjudication.

The question remains whether Carroll's claim has accrued.  One of the essential elements of a claim for negligent misrepresentation is injury.  See N.M. Pub. Schs. Ins. Auth. v. Arthur J. Gallagher & Co., 145 N.M. at 327-28, 198 P.3d at 353-54; First Interstate Bank of Gallup v. Foutz, 107 N.M. at 750-51, 764 P.3d at 1308-09; RST § 552; NMRA UJI 13-1632, at 230.  New Mexico law appears to be that, until a party has suffered an injury, there is no cause of action for negligence or, as in this case, negligent misrepresentation.  Spurlin v. Paul Brown Agency, Inc., 80 N.M. at 307, 454 P.2d at 964 ("[T]here was no cause of action for negligence until there had been a resulting injury.").  Because, however, New Mexico law draws a distinction between the injury that gives rise to a claim, the harm that results from the injury, and the damages that the injured party can recover, the Court finds that Carroll has been injured, and thus that his claim has accrued.

-33-

In an attempt to establish that Carroll's claim for negligent misrepresentation has not accrued, the Defendants attempt to establish that he has suffered no injury, harm, and/or damages. To a certain degree, this effort is an attempt to place the merits cart before the accrual horse. It is true that the Defendants pointed out at the hearing -- and Carroll did not contest -- that Carroll must make Social Security/Medicare contributions regardless which plan he selects. Employees are not eligible for Social Security/Medicare reimbursement until they retire. See Carroll Depo. Exhibit 17 at 1. With respect to those contributions, Carroll's position will not change financially unless and until he retires before March 2013. If he retires before that date and he is in TCP2, he will not be reimbursed for those contributions, whereas, if he had been in TCP1, those contributions would be reimbursed over the next several years. See Carroll Depo. Exhibit 17, at 2. If he retires after that date, he will be entitled to Social Security/Medicare benefits and will no longer be eligible for contribution reimbursement, regardless whether he is in TCP1 or TCP2. Thus, Carroll has not suffered any damages yet. Moreover, the number of Social Security/Medicare contribution payments that Carroll will make during his career -- and, thus, how many he will be deprived of if he retires before March 2013 -- will not be known until Carroll retires. The quantity of the damages is thus unknown.

New Mexico law does not expressly require that the plaintiff have suffered calculable damages before the cause of action accrues; New Mexico law requires only that the plaintiff suffer some injury. According to the Supreme Court of New Mexico, "there [is] no cause of action for negligence until there ha[s] been a resulting injury." Spurlin v. Paul Brown Agency, Inc., 80 N.M. at 307, 454 P.2d at 964. See Howell v. Burk, 90 N.M. 688, 693, 568 P.2d 214, 219 (Ct. App. 1977)("Generally, the cause of action does not accrue until injury occurs."). New Mexico courts draw a distinction, however, between injury and damages, and it appears that only the former is

necessary before a cause of action accrues.  See <u>Sandoval v. Baker Hughes Oilfield Ops., Inc.</u>, 146

N.M. 853, 215 P.3d 791, 798 (Ct. App. 2009)("A party seeking to recover damages has the burden

of proving the existence of injuries and resulting damage with reasonable certainty.").  In <u>New

Mexico Public Schools Insurance Authority v. Arthur J. Gallagher & Co.</u>, the Supreme Court of

New Mexico defined the "actual injury" that causes a malpractice claim to accrue as "the loss of a

right, remedy or interest, or the imposition of a liability." 145 N.M. at 325, 198 P.3d at 352 (quoting

<u>Sharts v. Natelson</u>, 118 N.M. 721, 725, 885 P.2d 642, 646 (1994)).  In <u>Sharts v. Natelson</u>, the

Supreme Court was even more explicit in distinguishing between the concepts of injury and

damages: "The terms 'damages' and 'injury' are used interchangeably by many courts to refer to

the 'actual injury' a client must suffer before the client has a claim for relief against his or her

attorney.  We recognize that these terms have distinct meanings." 118 N.M. at 725 n.1, 885 P.2d

at 646 n.1.  In <u>Lovelace Medical Center v. Mendez</u>, 111 N.M. 336, 342, 805 P.2d 603, 609 (1991),

the Supreme Court of New Mexico stated:

> Given that a tort has occurred (the doctor's negligence in performing the sterilization operation and failing to inform the mother of the unsuccessful outcome) and given that an injury has resulted from this tort (the mother's continued fertility, despite her desire and effort to be sterilized), what is the measure of damages to compensate her for the injury she has suffered?

111 N.M. at 342, 805 P.2d at 609.

The RST also draws a strong distinction between injury and harm.  Section 7, entitled "Injury

And Harm," states:

> (1) The word "injury" is used throughout the Restatement of this Subject to denote the invasion of any legally protected interest of another.

> (2) The word "harm" is used throughout the Restatement of this Subject to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause.

RST § 7.  The comment contrasting the two terms gives further guidance:

> The word "injury" is used throughout the Restatement of this Subject to denote the fact that there has been an invasion of a legally protected interest which, if it were the legal consequence of a tortious act, would entitle the person suffering the invasion to maintain an action of tort. . . .  The most usual form of injury is the infliction of some harm; but there may be an injury although no harm is done. Thus, any intrusion upon land in the possession of another is an injury, and, if not privileged, gives rise to a cause of action even though the intrusion is beneficial, or so transitory that it constitutes no interference with or detriment to the land or its beneficial enjoyment. So too, the mere apprehension of an intentional and immediate bodily contact, whether harmful or merely offensive, is as much an "injury" as a blow which breaks an arm. It is desirable to have a word to denote the type of result which, if the act which causes it is tortious, is sufficient to sustain an action even though there is no harm for which compensatory damages can be given.

RST § 7 cmt. a.  With respect to harm that has not yet manifested, the RST states:

> When an injured person seeks to recover for harms that may result in the future, he is entitled to damages based upon the probability that harm of one sort or another will ensue and upon its probable seriousness if it should ensue. . . . [Although] [t]here is no mathematical formula that will determine the chance of the harm occurring or that will gauge the monetary equivalent of the chance of loss[, t]his fact does not . . . prevent recovery for money damages, even though in the great majority of cases the amount will not correspond even approximately to the harm that will be suffered, since the amount is arrived at by considering probabilities . . . .

RST § 912 cmt. e.

This distinction between injury, harm, and damages has a rationale based in how the real world functions.  For example, a doctor or lawyer may commit malpractice, but the damages will not occur for many years.  The injury -- removing the wrong kidney, leaving a scalpel in a patient, writing a will that leaves the house to the wrong son, convincing the client to sign a detrimental contract -- has occurred; neither the defendant nor the plaintiff need do anything more to perfect the injury.  See, e.g., Tomlinson v. George, 138 N.M. 34, 37, 116 P.3d 105, 108 (2005)(discussing the rule that a medical malpractice action accrues at the time of the malpractice conduct, "even though the patient may be oblivious to any harm"); N.M. Pub. Schs. Ins. Auth. v. Arthur J. Gallagher & Co.,

-36-

145 N.M. at 325, 198 P.3d at 352 (holding a legal malpractice claim accrues upon "actual injury," defined as "the loss of a right, remedy or interest, or the imposition of a liability," not necessarily the accrual of damages).[22]  The plaintiff's interest in receiving skilled medical aid or legal work has been injured.  Harm may arise later and may be of an unknown quantity at the time of the injury. New Mexico has apparently decided, however, that there is no sound reason to delay bringing the lawsuit until damages fully manifest.  The plaintiff may, of course, face the potential pitfall of being unable to calculate his damages with the requisite certainty if they have not fully manifested.  If, however, damages are speculative at the time the plaintiff brings his claims, that problem can be

---

[22] The Court notes that some cases have refused to find that a negligence or products-liability cause of action has accrued until the plaintiff has shown some harm in the form of a physical ailment.  It appears that those generally arise in the context of dangerous-exposure cases, where a plaintiff alleges that he has been exposed to a harmful substance and therefore will likely suffer some debilitating illness in the future.  See Kelley v. Cowesett Hills Assocs., 768 A.2d 425 (R.I. 2001)("[T]he possibility of contracting cancer resulting from mere exposure to a carcinogen, although potentially increasing one's risk of developing cancer, is too tenuous to be a viable cause of action."); Capital Holding Corp. v. Bailey, 873 S.W.2d 187, 192 (Ky. 1994)("[W]ith a substance capable of causing cancer, just as with any other defective product, no cause of action accrues until the potentially harmful exposure actually 'causes injury that produces loss or damage.'").  The Court finds this case distinguishable from those.  None of the cases that the Court has found withholding accrual until the plaintiff has shown symptoms come from New Mexico courts, thus it is not clear what the New Mexico courts would do with that situation.  Moreover, in the exposure cases, there is no indication when or if harm will occur, nor is there any person who can affect when or if the harm will occur.  See Bonnette v. Conoco, Inc., 837 So. 2d 1219, 1230-31 (La. 2003)("A review of jurisprudence from other states reveals that a majority of jurisdictions have not recognized a cause of action for increased risk of future injury when the potential for the occurrence of future injury is speculative or merely 'possible.'"); Mauro v. Raymark Indus., Inc., 116 N.J. 126, 139, 561 A.2d 257, 264 (1989) ("[D]ecided cases . . . , both in the context of asbestos litigation and claims based on exposure to other toxic chemicals, are almost uniform in their conclusion that in order to recover damages, plaintiff must prove that the prospective disease is at least reasonably probable to occur.")(citing numerous cases).  In other words, unlike this case, in which Carroll can testify as to his prospective date of retirement, there is no situation in which the plaintiff can say, "I promise that a doctor will diagnose me with cancer in four years."  In any case, the Court believes that, based on current New Mexico law, the Supreme Court of New Mexico would, if confronted with this tort and the circumstances present in this case, find that the cause of action for negligent misrepresentation accrued when Carroll made his election relying on the incorrect or incomplete information that the Defendants provided.

-37-

addressed by another doctrine and not by the law of accrual of claims. Moreover, the damages used to remedy the harm, even future damages, need only be calculated to a reasonable certainty. See Rael v. F & S Co., Inc., 94 N.M. 507, 511, 612 P.2d 1318, 1322 (Ct. App. 1979)("Damages must be proved with reasonable certainty [and] [t]here is no exception to th[at] rule for future damages.")(citing Hebenstreit v. Atchison, Topeka & Santa Fe Ry. Co., 65 N.M. 301, 336 P.2d 1057 (1959)).

In this case, the wrongful conduct of which Carroll complains has occurred: the Defendants provided Carroll with incorrect information, and he had to make his pension-plan decision based on incorrect information. That factual premise is uncontested. Some injury has occurred: Carroll was forced to select his pension plan without being correctly informed about his options. While damages may not begin to accumulate until later, the injury -- making a decision with false information -- has occurred. The Court finds that Carroll's cause of action has accrued. Moreover, in this case, Carroll's damages need only be calculable with reasonable certainty, and the information provided by the parties allows the Court to reasonably calculate those damages.

### B.   CARROLL HAS SHOWN A FACTUAL ISSUE REGARDING HIS RELIANCE, BUT NOT THAT HIS RELIANCE CAUSED HIM HARM.

The first element of Carroll's negligent misrepresentation claim that the Defendants attack is reliance. The Defendants present a portion of deposition testimony in which Carroll refuses to state that, had he known the truth about TCP2 and that his Social Security/Medicare contributions would not be reimbursed under that plan, he would have selected TCP1. See Motion at 3, 6-8. Carroll responds by providing other passages in which Carroll makes statements to the effect that learning, erroneously, that his Social Security/Medicare contributions would be reimbursed under TCP2 was a deciding factor in his decision to select TCP2 over TCP1. See Response at 2, 10-12.

Carroll's position appears to be that his reliance on the false statement should not rise or fall on whether he states that his decision would have been different if he had known the truth.

It is undisputed that Carroll sought to learn whether TCP2 participants would have their Social Security/Medicare benefits reimbursed.  On the issue of reliance, the following exchanges occurred during Carroll's deposition:

> Q.      Did you call the hotline any time at all after you made your election?
>
> A.      Yes.
>
> Q.      How many times afterwards did you call?
>
> A.      Well, it was only a few, because after they gave me the initial answer that noncontributory Social Security people would be reimbursed for their contributions, then that was the answer that I could hang my decision on, and after that, it was the details that -- of how the accounting was going to be done and how the reimbursements were going to be done, and that was done mostly in writing.

Carroll Depo. at 50:2-13.

> Q.      And do you have a memory of the conversation where they gave you an answer?
>
> A.      Yes.  I remember great relief, because finally I had an answer, and I had something that I could make a judgment with.

Carroll Depo. at 51:8-12.

> Q.      Tell me everything you can recall about that conversation.
>
> A.      I asked the person on the other end of the phone the same question that I had been asking repeatedly, and she said, "we have an answer for you today," and then she proceeded to tell me what the decision was.
>
> Q.      Do you recall anything more than what you just told me about that conversation?
>
> A.      She said specifically that the decision had been made that the noncontributory people that would be paying -- now would be paying Social Security to LANS would have the -- their contributions reimbursed at some point.

-39-

I asked for detail, and she said they did not have that, but the decision had been made to reimburse the people. And that's what I needed to make my decision.

Carroll Depo. at 53:4-19.

Q. Regardless of whether Social Security and Medicare contributions were going to be reimbursed, didn't TCP2 still look like a better deal for you?

A. Yes.

Q. And that's, in fact, why you were leaning that way when you were asking the questions about the reimbursement, correct?

A. Yes.

Q. I want to make sure I understand your answer. If you had been told that only members of TCP1 would get their Social Security and Medicare reimbursed and that members of TCP2 would not, you would have still selected TCP2, because it still presented the better deal to you, correct?

A. No.

Carroll Depo. at 85:25-86:14.

Q. If you had been told that reimbursement was only available to TCP1 and not TCP2, then you would have considered going to TCP1 because of the way the benefits maxed out? Did I hear you correctly?

A. Yes, I thought about it.

Q. Thought about it. Can you testify here under oath, definitively, that you would have picked TCP1 if you had been told that Social Security and Medicare would only be reimbursed for members of TCP1 and not for TCP2?

A. Well, that's hypothetical since I didn't have the opportunity to do it.

Q. I guess my question is, hypothetically, if you had been told that reimbursement of Social Security and Medicare contributions was only available under TCP1 and not available under TCP2, can you definitively testify today you would have chosen TCP1?

A. I can testify that I would have much more carefully considered it.

Q. Is that the most you can say?

-40-

A.      Yeah.

Carroll Depo. at 86:23-87:18. Carroll's statements that learning, erroneously, that TCP2 participants would have their Social Security/Medicare contributions reimbursed was something he could "hang [his] decision on," "make a judgment with," and was "what [he] needed to make [his] decision," creates a genuine factual issue regarding reliance. That is bolstered by the fact that Carroll denied that he would definitely have chosen TCP2 even if he knew that TCP2 participants would not receive such reimbursements. Carroll could not, however, commit to the fact that he would definitely have selected TCP1 after learning that TCP2 participants would not have their contributions reimbursed. Nevertheless, Carroll has provided some evidence that he relied on the information provided.

Carroll must show, however, that his reliance caused the harm about which he complains. On that front, the Court finds the remainder of Carroll's testimony problematic. Although Carroll had the opportunity to testify that, had he known the truth, he would have selected TCP1, Carroll did not so testify. Rather, "the most [he] could say" was that "[he] would have much more carefully considered" TCP1 if he knew that TCP2 participants would not receive Social Security/Medicare reimbursements. While the Court appreciates Carroll's honesty, his indecision demonstrates that, at best, he does not know if the Defendants' conduct caused him any injury other than deprivation of the right to make a fully informed choice -- and possibly to still choose TCP2 even if the truth had been disclosed. Carroll might not be able to say with one-hundred-percent certainty that he would have chosen TCP1 in the hypothetical situation posed, but if he wants to impose tort liability on the Defendants for harm allegedly inflicted on him, he should at least be sure enough to state in deposition that he would have taken the other option if he had known the truth. The Court finds that Carroll's indecisive answer to the key deposition question -- whether his choice would have been

-41-

different if not for the Defendants' misrepresentation -- resulted in him having no evidence that the Defendants' conduct caused him injury.

Thus, the issue of reliance is by no means certain, but the Court finds that Carroll has at least created a genuine issue of material fact in regard to that element. The Court cannot, however, say the same about causation and damages. The Court therefore will grant the Defendants' motion on the grounds that Carroll has provided insufficient evidence that the Defendants' conduct caused him harm.

### C. CARROLL HAS NOT SHOWN A GENUINE ISSUE OF MATERIAL FACT THAT THE DEFENDANTS' MISINFORMATION HAS, OR WILL, HARM HIM.

The Defendants assert that, even if Carroll relied upon the incorrect information provided for him, he has not yet been harmed, because he will have to pay Social Security/Medicare contributions under either plan and will not be reimbursed until he retires. Next, they argue he will not be harmed, because he will financially benefit from selecting TCP2. Finally, they argue that his damages, if any, will be too speculative to be awarded until the time at which he retires. Carroll opposes all of these arguments. First, he asserts that damages is not an element of a negligent misrepresentation claim under New Mexico law. See Response at 12-13. Second, he argues that the harm has already been done, and the amount of his harm is not speculative because he has provided an affidavit indicating that he will retire on December 31, 2011. He thus asserts that the amount of his Social Security/Medicare contributions -- and, therefore, his damages under this theory of recovery -- can be calculated with certainty. See Response at 13-14.

### 1. It Is Undisputed that Carroll Will Not Be Able to Prove Damages.

Based on the evidence before the Court, Carroll will never have a claim of damages for negligent misrepresentation. Carroll has already reaped substantial benefit from selecting TCP2 in

the form of employer-match 401(k) contributions and pension payments from the University of California, to which he would not be entitled under TCP1.  Carroll has implied that he is unwilling to be disgorged of those benefits by withdrawing his claim to be instated into TCP1, but he still seeks to recover the potential detriment that he may or may not suffer from selecting TCP2.  If the Court were to try to calculate the present loss to Carroll, taking into account his gains from the selection of TCP2, the number would be negative, indicating Carroll's current net gain from the employer-matches to his 401(k) contributions and the years of pension benefits he has received from UCRP.  If the Court were to calculate Carroll's future loss based on the information before it, again, the number would be negative based on the benefit received from selecting TCP2.

Furthermore, the Court notes that Carroll's position appears internally inconsistent.  He asserts that he has a present claim for negligent misrepresentation, under which he should recover an unknown amount of Social Security/Medicare contributions, some of which he has not yet made, which may or may not have been reimbursed under TCP1.  He also argues, however, that his recovery should not be offset by the benefits garnered from the characteristics of TCP2.  The amount of damages is unknown because the amount of Social Security/Medicare contributions that Carroll will not have reimbursed will differ based on when, exactly, he retires.  The closer Carroll's retirement date is to March 2013, without going past that date, the more Social Security/Medicare contributions he will have made.  Likewise, the benefit from the TCP2 plan is unknown, because each month, up until the date of Carroll's retirement, Carroll will receive a benefit of UCRP retirement payments and employer-match contributions that he would not receive under TCP1.

> **2.**      **Carroll's Agreement to Retire on December 31, 2011 Remedies the Problem that Carroll's Future Damages Are Uncertain, but Does Not Show a Genuine Issue of Material Fact that He Will Be Harmed.**

Carroll argues that, although he did not know it at the time of his deposition, he now knows

that he will retire from LANL on December 31, 2011.  See Carroll Aff. ¶¶ 2-5, at 1.  Carroll

submitted with his response an affidavit wherein he stated that he would be willing to enter an

agreement with the Defendants that he would retire on that date.  See id. ¶ 5, at 1.  Mr. Gordon

argued against this representation at the hearing, asserting that: (i) Carroll could retire from LANL

as he promises, then return to work elsewhere after the suit is resolved, and achieve sufficient credits

to entitled him to Social Security/Medicare benefits, vitiating his damages; (ii) Carroll could be

injured before that time and become unable to work; (iii) Carroll could be laid off by LANL; or (iv)

Carroll could simply refuse to retire as agreed.  See Tr. at 5:12-6:5 (Gordon).

Even assuming that Carroll could be bound by the agreement that he proposes to make, the

only evidence before the Court shows that Carroll will not be harmed.  Assuming Carroll retires on

December 31, 2011, he will have his Social Security/Medicare contributions reimbursed to him over

the next five years at a rate of $9,151.44 for the first four years and $3,866.24 on the fifth year.[23]

At that rate, when Carroll has received the final payment of his Social Security/Medicare

reimbursement, he would have received a total payout of $537,492.00 from TCP1, whereas his total

compensation from TCP2 will be approximately $884,490.00.  See Carroll Depo. Exhibit 17.  Thus,

at the point at which Carroll would have received the funds of which he claims he was deprived, he

would still be in a position almost $350,000.00 ahead of where he would have been if he had chosen

---

[23] The Court's pay-out information comes from the calculation described in Carroll's Depo.
Exhibit 17: "The annual reimbursement amount will be equal to the total Social Security/Medicare
withholding for the employee during active employment with LANS . . . divided by the number of
months of active employment with LANS, multiplied by 12."   Carroll's total contributions are
projected to be $40,472.00, and he will have made contributions for approximately 53 months since
June 1, 2006.  $40,472.00 ÷ 53 = $762.62, and $762.62 × 12 = $9,151.44.  Carroll will receive
$9,151.44 each year until his remaining contributions yet to be reimbursed is less than that amount.
Four years at $9,151.44 per year equals $36,605.76, leaving a final payment of $3,866.24.  These
calculations may have some small amount of round-off error, but the total appears to be correct.

TCP1.

If the Court were to go a step further than Carroll asks, not limiting Carroll's recovery to the unpaid Social Security/Medicare contributions, but rather giving him all benefits of having selected TCP1, the Court would still find that Carroll is in a better position because he selected TCP2.  The life-expectancy table cited by Polito estimates that Carroll would likely live until approximately 2027.  See Polito Aff. ¶¶ 11-14, at 3-4; NMSA 1978, Chapter 17, Table 6-3 (Supp. 2009).  According to Polito's calculations, if Carroll retires on December 31, 2011, and lives to the end of his life expectancy under New Mexico law, Carroll will still be financially ahead by approximately $116,910.00 when he dies, having received $1,747,374.00 from selecting TCP2 instead of the $1,630,936.00[24] that he would have received under TCP1.  See id.  Carroll argues that the Defendants' calculation is flawed because it speculates about how long he will live, and thus the Defendants cannot prove that Carroll will not outlive that expectancy and reach a point at which his selection of TCP1 would become more profitable than TCP2.  See Tr. at 15:5-17 (Mozes).[25]  When the Court calculates a plaintiff's damages into the future, it must do so with a fixed end date, and for damages that are unrelated to a plaintiff's ability to work, that end date is generally the plaintiff's life expectancy.  See Wulf v. City of Wichita, 883 F.2d 842, 873 n.42 (10th Cir. 1989)("Courts are able to alleviate the uncertainty of future damages by taking into account . . . the employee's work and life expectancy . . .")(quoting EEOC v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d 1166, 1172

---

[24] This number differs from that on Polito's chart because it incorporates the Social Security/Medicare contributions that would be reimbursed over the five years after Carroll retired.

[25] Carroll does not, however, introduce any evidence, competent or otherwise, why the age of approximately 80 in the New Mexico Life Expectancy Table should not be used as the actual date of his likely death.  Accordingly, Carroll has not created a genuine issue of material fact about his life expectancy, and the Court can use the expected age of death set forth in the New Mexico Life Expectancy Table.

(10th Cir. 1985)).   Thus, while the promise, if enforceable, would remove the uncertainty of

Carroll's proposed damages, it would not remedy the more significant problem that Carroll cannot

prove that the Defendants' conduct harmed him.

### 3.   The Defendants Will Be Entitled to an Offset for the Benefits that Carroll's Selection Has Provided Him.

"When the defendant's tortious conduct has caused harm to the plaintiff or to his property

and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the

value of the benefit conferred is considered in mitigation of damages, to the extent that this is

equitable."  RST § 920; First Interstate Bank of Gallup v. Foutz, 107 N.M. at 750-51, 764 P.3d at

1308-09 (stating that, with respect to negligent-misrepresentation claims, New Mexico law would

use the damages measure found in the RST); Aragon v. Brown, 93 N.M. 646, 603 P.2d 1103 (Ct.

App. 1979)(holding that the collateral-source doctrine does not apply where the offsetting benefit

derives from the defendant or a source identified with the defendant), overruled on other grounds

by Smith v. Village of Ruidoso, 128 N.M. 470, 476, 994 P.2d 50, 57 (Ct. App. 1999).  In this case,

the Defendants' conduct appears to have incidentally benefitted Carroll, justifying an offset to the

total damages awarded in the amount of the benefit conferred.[26]  Furthermore, the purpose of tort

damages under New Mexico law is to make an injured person whole and not to put a person into a

better position than they had been before the alleged wrong was committed.  See Lovelace Med. Ctr.

v. Mendez, 111 N.M. 336, 349, 805 P.2d 603, 616 (1991)("In New Mexico, as elsewhere, the

---

[26] The Supreme Court of New Mexico has commented: "As comments a and b to [RST § 920] make clear, this 'offsetting benefits' principle applies only to reduction of damages for invasion of the same interest as the one that has been harmed."  Lovelace Med. Ctr. v. Mendez, 111 N.M. at 346, 805 P.2d at 613.  The interest involved in this case is Carroll's financial interest, which is the same interest that was incidentally benefitted by the Defendants' misrepresentation.  See RST § 920 cmt. b (giving examples of mismatched interests, such as a defendant attempting to offset harm to reputation by proving financial gain).

purpose of compensatory damages is to make an injured person whole.").  Yet, Carroll would be in a better position if the Court allowed him to collect his potentially lost Social Security/Medicare contributions without offsetting that by the benefits -- employer-matched plan contributions and early-retirement pension from the University of California -- which Carroll received from selecting TCP2.  The Court thus concludes, from the record before it, that Carroll is not able to prove that he was financially harmed by selecting TCP2 rather than TCP1.

  **IT IS ORDERED** that the Defendant's Motion for Summary Judgement is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Michael E. Mozes
Law Offices of Michael E. Mozes, P.C.
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Scott D. Gordon
Julie P. Neerken
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

  *Attorneys for the Defendant*